|  | AUSA: | John McCormack IV | Telephone: | (202) 262-7011 |
|---|---|---|---|---|
| AO 106 (Rev. 04/10)  Application for a Search Warrant | Agent: | Aaron Hann | Telephone: | (313) 348-5860 |

# UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

| In the Matter of the Search of | | Case: 5:19−mc−51303 |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) ) ) ) ) | Assigned To : Levy, Judith E. |
| | | Assign. Date : 9/9/2019 |
| Dr. Anthony Weinert, DPM., P.C. | | Case No. Description: RE: SEALED MATTER (EOB) |
| 3272 East 12 Mile  Suite #101 | | |
| Warren, Michigan 48092 | | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the _____Eastern_____ District of _____Michigan_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 1347 | Health Care Fraud |
| Title 18 U.S.C § 287 | False, Fictitious, or Fraudulent Claims |

The application is based on these facts:

See attached AFFIDAVIT.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Aaron Hann
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____September 9, 2019_____

_____
*Judge's signature*

City and state:  Detroit, Michigan

Hon. XXXXXXXXXXXX      U. S. Magistrate Judge
David R. Grand      *Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| IN THE MATTER OF:<br>THE SEARCH OF<br><br>Dr. Anthony Weinert, DPM., P.C.<br>3272 East 12 Mile<br>Suite #101<br>Warren, Michigan 48092<br><br>Troy Surgicare, PLLC<br>230 West Maple<br>Suite #101<br>Troy, Michigan 48084 | Case No. _____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

The undersigned, Aaron Hann, being first duly sworn, hereby deposes and states as follows:

1.     This affidavit is made in support of an application for a search warrant for the office of Dr. Anthony Weinert, DPM., P.C. ("DAW") located at 3272 East 12 Mile, Suite 101 Warren, Michigan 48092 ("Subject Premises #1"), and Troy Surgicare, PLLC ("TS") located at 230 West Maple, Suite #101 Troy, Michigan 48084 ("Subject Premises #2").

2.     The Subject Premises are more fully described in Attachment A, while Attachment B sets forth certain items and property, including but not limited

to, financial records, patient files, computers and other evidence, fruits and

instrumentalities of criminal conduct to be seized.

## AFFIANT'S BACKGROUND AND QUALIFICATIONS

3.      I, Aaron Hann ("Affiant"), am a Special Agent employed by the

United States Department of Health and Human Services, Office of Inspector

General, Office of Investigations ("HHS-OIG").  I have been so employed by

HHS-OIG since May of 2015.

4.      I am an investigative or law enforcement officer of the United States

within the meaning of Section 2510 (7) of Title 18, United States Code, in that I

am empowered by law to conduct investigations and to make arrests for federal

felony offenses.

5.      I am currently assigned to the Detroit Field Office, and as part of my

official duties, I am authorized to conduct investigations, audits, and inspections in

connection with the administration and enforcement of laws, regulations, orders,

contracts, and programs in which HHS is, or may be, a party of interest, and

perform other duties on behalf of the Secretary of HHS.  I have gained experience

in how to conduct such investigations through specialized trainings, seminars,

courses, and from my participation in previous HHS-OIG investigations.

6.      My duties and responsibilities as a Special Agent include conducting

criminal investigations of individuals, organizations and businesses that have violated federal laws, including, but not limited to, those laws found in 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. § 287 (False, Fictitious, or Fraudulent Claims).

7.     Previously, from 2009 to 2015, I was a Special Agent with the United States Secret Service.  There, I investigated fraud, financial crimes, and other crimes against the United States.  Additionally, I was previously employed as a police corporal with the Dearborn, Michigan Police Department for nearly eleven years where I investigated a variety of violations of state law and local ordinances.

## PURPOSE OF THE AFFIDAVIT

8.     I have knowledge of the facts set forth in this Affidavit as a result of my participation in the investigation, as well as information provided to me by other law enforcement agents involved in this investigation and others. Information pertinent to this investigation was also provided by AdvanceMed, zone program integrity contractor ("ZPIC") for Michigan, which contracts with HHS to perform investigations and audits designed to protect the Medicare program from waste, fraud, and abuse.

9.     I have been investigating DAW since January 2019 for violations of:

A) Title 18 U.S.C. § 1347, Health Care Fraud; and
B) Title 18, U.S.C § 287, False, Fictitious, or Fraudulent Claims.

10.     This affidavit is respectfully submitted in support of the

Government's application for a search warrant of the Subject Premises.  Based

upon my training and experience investigating healthcare fraud and the

information set forth below, I have reason to believe, and do believe, that there are

documents and items that are evidence, fruits and instrumentalities of violations of

the following federal criminal statutes within the Subject Premises:

        A)     Title 18 U.S.C. § 1347, Health Care Fraud; and
        B)     Title 18, U.S.C § 287, False, Fictitious, or Fraudulent Claims.

11.     I further submit that based on the evidence set forth below, and all

reasonable inferences from that evidence there is probable cause to believe that

evidence, instrumentalities and fruits of these violations, as more fully described in

Attachment B, will be found within the Subject Premises.

12.     Because this Affidavit is being submitted for the limited purpose of

supporting a search warrant, I have not included each and every fact known to me

concerning this investigation.

## VIOLATION STATUTES

13.     Title 18, United States Code, Section 1347, prohibits health care

fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme

or artifice—

        (1)     to defraud any health care benefit program; or

(2)     to obtain, by means of false or fraudulent pretenses,

representations, or promises, any of the money or property owned by,

or under the custody or control of, any health care benefit program, in

connection with the delivery of or payment for health care benefits,

items, or services, shall be fined under this title or imprisoned not more

than 10 years, or both.

14.     Title 18, United States Code 287, prohibits false, fictitious, or

fraudulent claims against the United States: Whoever makes or presents to any

person or officer in the civil . . . service of the United States, or to any department

or agency thereof, any claim upon or against the United States, or any department

or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall

be imprisoned not more than five years and shall be subject to a fine in the amount

provided in this title.

15.     Title 18, United States Code, Section 24(b), defines a "health care

benefit program" as, among other things, "any public or private plan . . . affecting

commerce, under which any medical benefit, item, or service is provided to any

individual, and includes any individual or entity who is providing a medical

benefit, item, or service, for which payment may be made under the plan."

## THE MEDICARE PROGRAM

### A.    BACKGROUND

16.    The Medicare Program ("Medicare") is a federally-funded health care program providing benefits to persons who are sixty-five years or older, or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the Department of Health and Human Services ("HHS").  Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

17.    Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

18.    Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).  Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

19.    This investigation involves podiatry services which are covered by Medicare Part B.

20.    By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement.  To receive Medicare funds, enrolled providers, together with their

authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

21. Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for at least a period of six years.

22. CMS relies on a network of Medicare Administrative Contractors ("MACs") to process Medicare claims, and MACs serve as the primary operational contact between the Medicare Fee-For-Service program and the approximately 1.5 million health care providers enrolled in the program. MACs enroll health care providers in the Medicare program and educate providers on Medicare billing requirements, in addition to answering provider and beneficiary inquiries.

### B. MEDICARE BILLING/PROCEDURE CODES

23. The American Medical Association assigns and publishes numeric codes, known as the Current Procedural Terminology ("CPT") and Health Care Procedure Common Coding System ("HCPCS") codes. The codes are a systematic listing, or universal language, used to describe the procedures and services performed by health care providers.

24.     The procedures and services represented by the CPT and HCPCS codes are health care benefits, items, and services within the meaning of 18 U.S.C. § 24(b).  They include codes for office visits, diagnostic testing and evaluation, and other services.  Health care providers use CPT and HCPCS codes to describe the services rendered in their claims for reimbursement to health care benefit programs.

25.     Health care benefit programs, including Medicare, use these codes to understand and evaluate claims submitted by providers and to decide whether to issue or deny payment.  Each health care benefit program establishes a fee or reimbursement level for each service described by a CPT or HCPCS code.

26.     Health care providers often seek reimbursement from insurance carriers on CMS Form 1500.  On the form, the provider identifies itself by its Provider Identification Number ("PIN") or Tax Identification Number ("TIN"), identifies the beneficiary who received the services, describes the illness or injury that makes the services medically necessary, and identifies the services provided by CPT and HCPCS codes.  The insurance carrier will issue a payment or denial in response to the information contained in each CMS Form 1500.

27.     The Medicare Claims Processing Manual issued by CMS, is publicly available, and offers day-to-day operating instructions, policies, and procedures

8

based on statutes and regulations, guidelines, models, and directives for Medicare Part B.

28.     The Medicare insurance program only pays for medical procedures that are "reasonable and necessary for the diagnosis or treatment of illness or injury," and generally excludes from coverage "routine foot care," defined in part as "trimming of nails" (Social Security Act§ 1862, 42 U.S.C. §1395y(l)(a)(13)(C)). Therefore, under most circumstances, podiatrists cannot bill Medicare for routine foot care. Some routine foot care procedures may be reimbursed by Medicare for certain patients with systemic diseases of sufficient severity that performance of such services by a non-professional person would put the patient at risk.  Such routine foot care reimbursements under those codes are significantly lower than the reimbursements for nail avulsions. Therefore, even if some routine foot care may be reimbursable by Medicare billing those procedures using a nail avulsion code constitutes a false claim.

29.     A nail avulsion is defined by Medicare as a "surgical procedure" that involves the separation and removal of a border of, or the entire nail, from the nail bed to the eponychium. The eponychium is the distal margin of the superficial layer of a proximal nail fold that is a band of epidermis extending over the base of a nail. It is often referred to as the cuticle. For this procedure to be considered a

9

nail avulsion, it must be performed using an injectable anesthesia except in the instances in which a patient is devoid of sensation or there are extenuating circumstances in which injectable anesthesia is not required or is medically contraindicated. Performing a nail avulsion can be billed to Medicare under CPT Codes 11730 and 11732.  Nail removal code 11750 is similar to a nail avulsion procedure except the nail bed is permanantly killed for whatever width of nail is removed.

| Procedure Code | Procedure Code - Long Description |
|---|---|
| 11730 | Avulsion of nail plate, partial or complete, simple |
| 11732 | Avulsion of nail plate, partial or complete, simple |
| 11750 | Removal of nail |

30.    Furthermore, "trimming, cutting, clipping or debriding of a nail, distal to the eponychium, will be regarded as routine foot care. It is not appropriate to report CPT codes 11730/11732 when performing these services." (Medicare Local Coverage Determination #L26424 - Rev. Eff. 03/01/10).

31.    Conversely, trimming or debriding of nails, if justified by a documented medical condition, can be billed to Medicare under CPT Codes 11719, 11720, and 11721.

| Procedure Code | Procedure Code - Long Description |
|---|---|
| **11719** | Trimming of non-dystrophic nails, any number |
| **11720** | Removal of tissue from 1 to 5 finger or toe nails |
| **11721** | Removal of tissue from 6 or more finger or toe nails |

## SUBJECT PREMISES

32.     DAW and TS are registered business entites with the Michigan Department of Licensing and Regulatory Affairs ("LARA"). DAW was incorporated as a podiatric office, on March 10, 2003.  LARA lists Anthony Weinert ("Weinert") as the incorporator, president, treasurer, secretary, director and registered agent of DAW.  DAW's registered office address is 3272 East 12 Mile, Suite 101 Warren, Michigan 48092.  TS was organized as a podiatric office, on May 5, 2011.  LARA lists Weinert as the organizer, member and registered agent of TS.  TS' registered office address is 230 West Maple, Suite #101 Troy, Michigan 48084.

33.     During the course of this investigation, I obtained Medicare documents related to DAW which revealed that the Subject Premises #1 is the primary practice location.  Additionally, despite his separate entities, it appears all of Weinert's billing is submitted through DAW.  However, each office is

ostensibly operated as a separate entity.

34.     On September 5, 2019, I went to DAW and observed a desktop computer located at the reception desk.

## OVERALL FRAUD SCHEME

35.     Based upon information obtained by HHS-OIG and the FBI, and a thorough review of Medicare claims data, there is probable cause to believe, and I do believe, that DAW (a) submitted and caused the submission of false and fraudulent claims to Medicare for services that were not medically necessary and/or were not provided to Medicare beneficiaries; and (b) submitted and caused the submission of false and fraudulent claims to Medicare for services beyond what was actually performed on the beneficiary, a practice which is also known as upcoding.

## PROBABLE CAUSE

### A.     DAW MEDICARE ENROLLMENT INFORMATION

36.     Medicare approved DAW as a provider and issued DAW the provider identification number (PIN) OP15600, effective July 1, 2005.

37.     Weinert submitted a Medicare enrollment update application (CMS 855I) on behalf of DAW in February 2014.  Weinert was listed as a contact and signed the certification statement provider enrollment documents on the CMS

855I.

38.     Weinert signed the Electronic Data Interchange ("EDI") on behalf of DAW agreeing that DAW would only submit claims that were accurate, complete, and truthful.

39.     Weinert is the only provider listed on DAW's Medicare enrollment documents.

## B.     MEDICARE CLAIMS ANALYSIS

40.     Analysis of Medicare Part B data reveals that from January 2010 through August 2019, DAW, utilizing PIN OP15600 for DAW, billed Medicare Part B approximately $5,165,066,13 for services purportedly provided by Weinert. Medicare paid DAW approximately $1,977,117.05 for these claims.

41.     During the same time frame, DAW billed Medicare Part B approximately $373,455.00 for CPT 11730 (separation of nail plate from nail bed, also known as a partial nail avulsion) for services purportedly provided by Weinert.  Medicare paid DAW approximately $149,563.56 for these claims.  DAW billed Medicare for approximately 2,651 separate CPT 11730 claims.  Further, DAW billed Medicare Part B approximately $257,390.00 for CPT 11750 (removal of nail, also known as a permenant nail avulsion) for services purportedly provided by Weinert.  Medicare paid DAW approximately $101,103.90 for these claims.

DAW billed Medicare for approximately 858 separate CPT 11750 claims.  See below:

| CPT Code | Number of Claims | Amount Billed | Amount Paid |
|----------|------------------|---------------|-------------|
| 11730 | 2,651 | $      373,455.00 | $      149,563.49 |
| 11750 | 858 | $      257,390.00 | $      101,103.90 |

42.    In summary, a sample of DAW patients have been interviewed and advised investigators that they have not received nor required treatment for these procedure codes.

## C.    WEINERT STATEMENT

43.    On August 23, 2019, Weinert was interviewed by Blue Cross / Blue Shield field investigator Sue Post ("Post") at TS (Subject Premises #2).   Weinert told Post that his practice has another location in Warren, Michigan.  The Troy location has been open since approximately 2012.  Weinert explained that the Warren location is open on Tuesdays and Thursdays, whereas the Troy location is open on Mondays, Wednesdays and half days on Fridays.  Weinert explained that he is the only doctor on staff and describe his practice as a "solo practice."

44.    Weinert stated that he sees patients and maintains patient records at both locations.  Patients typically only go to one location, but occasionally a patient wll be seen at both the Warren and Troy offices.  Weinert told Post that he

uses electronic medical records software to create his patient files.

45.     Weinert explained that a partial nail avulsion, CPT 11730, is used with respect to ingrown nails.  Sometimes it is possible to have a reocurring ingrown nail on the same toe.  If a patient is having a chronic issue with ingrown nails, he will do a permanent removal, CPT 11750, with a chemical, Phenol, that kills the root and matrix of the nail.  The purpose of the permanent removal is to kill the root of the nail so it does not grow back.  Post asked Weinert if he would ever do a permanent removal more than once on the same toe and Weinert explained that sometimes the Phenol "doesn't take" and he would have to perform the permanent nail removal procedure again,  but "for the most part, most of them should be permanent."  Weinert further explained that the circumstance where he would have to do the permanent nail removal procedure again is "not a high percentage" of the time.

46.     Additionally, during the interview, Post observed multiple computers located in the TS office to include a laptop computer on Weinert's desk at the time of her interview.

### D.     WITNESS INTERVIEWS

#### *PATIENT I.J.*

47.     I.J. was interviewed on September 9, 2018.

48.     I.J. said he/she has been a patient of Weinert for several years and sees him about once per month.  I.J. explained he/she met Weinert when he performed a demonstration in his/her senior apartment building.  Since then, I.J. said Weinert comes to his/her apartment building to "see patients and cut toenails."

49.     I.J. stated that he/she has only had two nail avulsions performed on him/her.  I.J. specifically stated that he/she had a partial nail avulsion performed both of his/her big toes only once.

50.     From July 2014 until July 2018, DAW billed Medicare, on behalf of I.J., for 19 nail avulsions, CPT 11730, and 18 removal of nails, CPT 11750 purportedly performed by Weinert. [1]  DAW billed Medicare $8,390.00 and was paid $2,196.48 in connection with those claims.

51.     In 2019 alone, DAW has billed Medicare, on behalf of I.J. for an additional four nail avulsions and three permenant removal of nails.

### PATIENT M.C.

52.     M.C. was interviewed on January 17, 2019.

53.     M.C. said he/she has been a Medicare patient of Weinert for about

---

[1] 17 of the claims for the removal of nails, CPT 11750, are for permanent removals of the nail on the same toe, including 4 claims for the permanent removal of the nail on second digit of the left foot, 3 claims for the permanent removal of the nail on the fifth digit of the left foot, 3 claims for the permanent removal of the nail of third digit of the right foot and 3 claims for fourth digit of the right foot.

eight years and sees him about every three months.[2]  M.C. said nearly all of his/her appointments are limited to having his/her toenails trimmed and an examination of his/her feet for cuts because he/she is pre-diabetic.  Weinert trims his/her nails and examines his/her feet.

54.    M.C. said Weinert has never removed a toenail, or attempted to permenantly remove a toenail.

55.    From June 2012 until December 2017, DAW billed Medicare, on behalf of M.C., for 17 nail avulsions, CPT 11730, and 11 removal of nails, CPT 11750 purportedly performed by Weinert.[3]  DAW billed Medicare $5,895.00 and was paid $1,536.96 in connection with those claims.

*PATIENT L.G.*

56.    L.G. was interviewed on August 7, 2019 and September 5, 2019.

57.    L.G. said he/she has been a patient of Weinert since 2010 and Weinert schedules his appointments for every two weeks. L.G. indicated that he typically sees Weinert at DAW but has seen him once at TS.  L.G. described a typical appointment with Weinert as a simple nail trimming and evaluation of his feet.

---

[2] Medicare claims data indicates that M.C. has only seen Weinert on Tuesdays and Thursdays, which according to Weinert are the days that only DAW is open. Furthermore, the claims data indicates that all the services that Weinert rendered to M.C. were performed in an office setting.

[3] 8 of the claims for the removal of nails, CPT 11750, are for permanent removals on the same toe, including 3 claims for the permanent removal of the nail on the third digit of the right foot and 3 claims for the permanent removal of the nail on the third digit of the left foot.

During some visits, Weinert has attempted to drain some fluid from his left foot which was injured in an auto accident.

58.     L.G. said Weinert has only performed nail avulsions on him/her on two or three occasions since 2010.

59.     From April 2014 until January 2018 , DAW billed Medicare, on behalf of L.G., for 29 nail avulsions, CPT 11730, and 25 removal of nails, CPT 11750 purportedly performed by Weinert.[4]  DAW billed Medicare $12,070.00 and was paid $2,909.23 in connection with those claims.

### PATIENT P.F.

60.     P.F. was interviewed on August 21, 2018 and on September 3, 2019.

61.     P.F. said he/she first went to Weinert about six years ago.  P.F. typically drives himself to appointments at DAW on 12 Mile.  P.F. indicated that he saw Weinert at TS on one occasion.

62.     P.F. stated that about a year and a half ago, he/she had one toenail removed his/her left big toe.

63.     From March 2010 until November 2017, DAW billed Medicare, on

---

[4] 22 of the claims for the removal of nails, CPT 11750, are for permanent removals on the same toe, including 6 claims for the permanent removal of the nail on the fourth digit of the left foot, 4 claims for the permanent removal of the nail on the fifth digit of the left foot, 3 claims for the permanent removal of the nail on the third digit of the left foot and 3 claims of the permanent removal of the nail on the third digit of the right foot.

behalf of P.F., for 43 nail avulsions, CPT 11730, and 55 removal of nails, CPT 11750 purportedly performed by Weinert.[5]  DAW billed Medicare $22,030 and was paid $6,605.48  in connection with those claims.

### PATIENT G.G.

64.    G.G. was interviewed on August 7, 2019 and on September 3, 2019.

65.    G.G. indicated that he/she was patient of Weinert from approximately 2010 until 2015.  G.G. indicated that he/she saw Weinert at both the DAW and TS locations.  G.G. stated that, in total, he/she had one or two nail avulsions performed by Weinert.

66.    From July 2010 until November 2014, DAW billed Medicare, on behalf of P.F., for 25 nail avulsions, CPT 11730, and 22 removal of nails, CPT 11750 purportedly performed by Weinert.[6]  DAW billed Medicare $9,230 and was paid $4,524.89  in connection with those claims.

---

[5] 52 of the claims for the removal of nails, CPT 11750, are for permanent removals on the same toe, including 8 claims for the permanent removal of the nail on the third digit of the left foot, 8 claims for the permanent removal of the nail on the third digit of the right foot, 7 claims for the permanent removal of the nail on the fourth digit of the right foot, 6 claims for the permanent removal of the nail on the second digit of the left foot, 6 claims for the permanent removal of the nail on the second digit of the right foot, 4 claims for the permanent removal of the fifth digit of the right foot, and 3 claims for the permanent removal of the nail on the fifth digit of the left foot.

[6] 19 of the claims for the removal of nails, CPT 11750, are for permanent removals on the same toe, including 6 claims for the permanent removal of the nail on the great toe of the right foot, 6 claims for the permanent removal of the nail on the third digit of the right foot, 3 claims for the permanent removal of the nail on the fourth digit of the right foot.

67.    Investigators shared the Medicare billing data with G.G.  In response, G.G. stated that he/she does not like how Weinert put so much false information in his/her file.

## REQUEST TO SEIZE COMPUTERS AND COMPUTER RECORDS

68.    Based on my training and experience, business offices rely upon computers to create and store data, including billing data.  It is likely that the providers' insurance billing, patient records, documents, and materials will be found stored on computers in their respective offices.

69.    For the reasons stated above, there is probable cause to believe that one or more computers at the Subject Premises were used to generate false billings and contain information including records, documents, and materials relating to these crimes.

70.    Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (computer personnel) will access any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data.  If computer personnel determine that these items cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, the agents will seize the computer equipment and storage devices for the purposes

of conducting an off-site search, consistent with Federal Rule of Criminal Procedure 41(e)(2)(B).

71.    If the computer personnel determine that the data reviewed does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time from the date of seizure unless further authorization is obtained from the court.

72.    Authority is sought to search any computer related equipment capable of creating and/or storing information in electronic or magnetic form for the items listed in Attachment B.  "Computer related equipment" refers to:

> a. Computer hardware, consisting of all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical,  or similar computer impulses or data. Hardware includes, but is not limited to,  any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or "notebook" computers, "palm pilots" or  personal data assistants, "tablet" computing devices, smartphones, iPods or  other similar media devices, memory facsimile machines, and "schedulers"); internal and peripheral storage devices (such as fixed disks, external hard  drives, floppy disk drives and diskettes, USB storage devices,

optical storage devices, transistor-like binary devices, read/write CD and DVD devices, and any and all storage devices); peripheral input/output devices (such as keyboards, printers, scanners, video display monitors, mouse devices); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks);

b. Computer software, that is, digital information that can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, networking, graphics, accounting, presentations or spreadsheet programs), utilities, compilers, interpreters, and communications programs;

c. Computer passwords and other data security devices, that is, a string of alphanumeric characters designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programmable code. A password usually operates as a sort of digital key to "unlock" particular storage data

security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, destroy or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it;

d. Related communication devices, such as modems, facsimile machines, telephone equipment with built-in memory devices, and answering machines, together with system documentation, operating logs and documentation, software and instruction manuals.

73.   If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system(s) utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines the material found on the premises is too voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized. Authority is sought to seize software,

documentation and instruction manuals, operating logs and manuals, utility programs, compilers, interpreters, cabling and connectors, or any other equipment, programs, or software used to facilitate direct or indirect communication with the computer hardware and/or software.

74.    In most cases, a thorough search of the premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

75.    Based on the foregoing, and consistent with Rule 41(e) (2) (B), when persons executing the warrant conclude that it would be impractical to review the media on-site, authority is sought to seize or image storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant.  The examination may require techniques, including but not limited to computer assisted scans of the entire

medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## SPECIAL INSTRUCTIONS REGARDING REVIEW OF SEIZED MATERIALS

76.     With respect to law enforcement's review of the seized material identified in Attachment B, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized material.

77.     If, during the review of the seized material, the review team finds potentially privileged materials,  the review team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue.  Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

## CONCLUSION

78.     Based on the foregoing, there is probable cause to believe, and I do believe, that the Subject Premises will contain the items set forth in Attachment B, which constitute evidence, fruits of crime, contraband, and/or instrumentalities of the violations of Title 18, United States Code, Section 1347 (Health Care Fraud), and Title 18, U.S.C § 287, (False, Fictitious, or Fraudulent Claims).

## REQUEST FOR SEALING

79.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

_____
Aaron Hann, Special Agent
HHS-OIG

26

Sworn to before me and signed in my
presence and/or by reliable electronic means.

_____   David R. Grand
HONORABLE ~~ANTHONY P. PATTI~~
United States Magistrate Judge
Eastern District of Michigan

Dated:   September 9, 2019

27

## ATTACHMENT A

Premises to be searched are:

Subject Premises #1:  Dr. Anthony Weinert, DPM., P.C. located at 3272 East 12
Mile, Suite 101 Warren, Michigan 48092.



Dr. Anthony Weinert, DPM., P.C. ("DAW") is located on the southwest corner of
Twelve Mile and Norwood in Warren, Michigan.  The complex, Leerfield
Meadows, is a large brown brick structure with a brown roof that houses multiple
business suites.  The building's address is marked on the front marquis in large
white numbers, "3272."  Dr. Anthony Weinert, DPM., P.C. (Suite 101) is marked
with gold lettering on the window above the entrance door to DAW.  The entrance
door is on the east side of the building and faces east.  The door is made of metal

and glass and has vinyl lettering that reads, "Anthony Weinert Physician & Surgeon Foot & Ankle."

Subject Premises #2:  Troy Surgicare, PLLC ("TS") is located at 230 West Maple, Suite #101 Troy, Michigan 48084.





Troy Surgicare ("TS") is located in the rear lower level of the Truvista Center at 230 West Maple in Troy, Michigan.  The building's address is marked on the front marquis in large white numbers, "230."  The Truvista Center is a reddish brown brick structure with a flat roof that houses multiple business suites.  The entrance to TS is located in the rear of the building under a covered entrance.  TS is on the lower level just inside the rear entrance.  TS occupies suite 101.  On the glass door leading to suite 101 is silver vinyl lettering that reads, "Dr. Anthony Weinert Foot and Ankle Specialist Troy Surgicare."  To the left of the door is a wall placard that reads, "Suite 101 Foot and Ankle Specialist Anthony Weinert, DPM Troy Surgicare (248) 362-3338."

## ATTACHMENT B – ITEMS TO BE SEIZED

For the time period of January 1, 2010, to present - any and all of the following items concerning or related to any individual or entity, known or unknown, who is reasonably believed to be part of the scheme or a beneficiary of the scheme. This information may be stored or filed and includes any format in which the information may exist, including, without limitation, the media of hard copy, computer hard disc, digital storage devices, computer discs:

1.  All records related in any way to patients of any of the above persons or businesses, including, without limitation, the following type of records: patient charts, files, records, treatment cards, prescription records, patient ledger cards, patient complaints, patient sign-in sheets, physician notes, nursing notes, medical assistant notes, physical therapy records, physical therapist notes, original patient or referral source listings.

2.  All documents constituting, concerning, or relating to bills, invoices and claims for payment or reimbursement for services billed to insurance companies, including Medicare, for any patients.

3.  All financial and tax-related books, records and documents related in any way to the above persons or businesses, including, without limitation:

    a.  Bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, stock fund accounts, bonds or bond

funds; including deposits and disbursements, canceled checks or drafts, electronic transfers, ledgers, loan statements, and loan agreements;

b.   Credit/Automatic Teller Machine/Debit card accounts;

c.   All corporate, business, and personal tax returns, including, without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Form 1099s;

d.   All loan and credit information, including, without limitation, any letters of credit, revolving credit arrangements, loans, loan applications, financing arrangements, factoring arrangements, promissory notes, leases, or any other documents concerning sources of borrowed funds, including any applications;

e.   All information relating to the purchase, titling and insurance of vehicles, real estate and other assets, including safe deposit boxes and keys;

f.   All financial statements, accounts payable/receivable, and credit reports.

4.   Documentation of all patient appointments or scheduling and patient sign-in sheets.

5.      All documents consisting, concerning or relating to all current and former employees, including, without limitation, personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements and W-2 forms.

6.      All documents constituting, concerning or relating to work and personal diaries, calendars, logs, appointment books, and schedules.

7.      All invoices and supporting documentation evidencing monies owed to or received from any of the above referenced individuals or business.

8.      All contracts, billing agreements, professional services agreements, or any other contracts between the above referenced individuals or business, and any other individual, company, physician or billing company.

9.      All Medicare handbooks, manuals, newsletters or other Medicare publications.

10.     Records of control over other areas such as storage units where financial, medical or other billing records may be maintained.

11.     Records of control of the premises and things described, namely, utility bills, telephone bills, rent or lease records pertaining to or evidencing ownership or control of the premises to be searched.

34

12.   All retrievable information such as recorded telephone messages, and other electronically stored information and computer hardware, including, without limitation, floppy discs, compact discs or other data storage discs or tapes, thumb or flash drives.  Any electronic storage media, including, without limitation, , pagers, electronic organizers, and PDAs, may be held for such reasonable time as necessary to determine whether it contains data within the ambit of this warrant.  Where data is found on a personal computer storage drive file, the agents executing this search warrant are authorized to seize, where necessary, the computer system's input/output or "I/O" devices, software, documentation, and data security devices. When the computer analyst determines that these items are no longer necessary to retrieve and preserve that data evidence, they will be returned within a reasonable time.

13.   Instructions, memoranda, passwords, and other information relating to, or required to facilitate the operation of any computer equipment which contains any of the aforesaid information.

14.   Organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, including, without limitation, articles of incorporation, by-laws and annual reports.

15.   All correspondence, including memoranda, letters, and electronic mailings (emails) concerning any of the records described in the previous paragraphs.

16.     Currency or other items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

17.     Records related to assets or items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

18.     Regarding records and information pertaining to the above stated offense which may be stored in digital form, law enforcement personnel executing this search warrant will employ the following procedure in searching for data capable of being read, stored or interpreted by a computer:

   a.  Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether or not these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

   b.  If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the preservation of the data, then the computer personnel will determine whether it is practical to copy/image the data.

c. If the computer personnel determine it is not practical to perform on-site searching, copying or imaging (due to time, technical or other considerations), then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d. Any data storage device that is encrypted and unreadable will not be returned until law enforcement personnel have determined that it or its data do not constitute (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed property, or (5) items that fall within the list of items to be seized set forth within.

e. In searching the data, computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.

f. If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41 (b), the government will return these items within a reasonable period of time.

g. In order to search for data pertaining to the above stated offenses that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

    i. Any computer equipment and storage device capable of being used to commit or store evidence of the offenses listed above;

    ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including but not limited to word processing equipment, modems, docking stations, monitors, printer, plotters, encryption devices, and optical scanners;

    iii. Any magnetic, electronic or optical storage device capable of storing data such as floppy disks, fixed hard disk drives, external hard drives and enclosures, network attached storage units, removable hard disk cartridges, tapes, laser disks, videocassettes, CD's, DVD's, zip disks, smart cards, memory sticks, memory calculators, PDA's, USB flash drives, printers and fax machines with memory buffers, PC cards, electronic dialers, electronic notebooks, mobile telephones, answering machines and/or other media that is capable of storing magnetic coding;

    iv. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;

38

v.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.  Any physical keys, encryption devices or similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii.  Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

19.  The terms records, documents, communications, and applications, includes all of the foregoing items of evidence in whatever form and by whatever means such records, documents, communications, applications, their drafts or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing or drawing with any implement, on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, photocopies); any mechanical form (such as printing or typing); any electrical, electronic or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard drives, backup tapes, CD ROMs, optical discs, printer buffers, smart cards, memory

calculators, or electronic notebooks, as well as printouts and readouts from any magnetic storage device).

## ADDENDUM TO ATTACHMENT B

With respect to law enforcement's review of the Devices, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the Devices (collectively, the "Review Team") are hereby authorized to review, in the first instance, the Devices and the information and materials contained in them, as set forth in this Attachment B. If law enforcement determines that all, some, or a portion of the information or materials on the Devices contain or may contain information or material subject to a claim of attorney-client privilege or work-product protection (the "Potentially Privileged Materials"), the Review Team is hereby ordered to: (1) immediately cease its review of the specific Potentially Privileged Materials at issue; (2) segregate the specific Potentially Privileged Materials at issue; and (3) take appropriate steps to safeguard the specific Potentially Privileged Materials at issue. Nothing in this addendum shall be construed to require law enforcement to cease or suspend the Review Team's review of the Devices upon discovery of the existence of Potentially Privileged Materials on one or more of the Devices.

AUSA:   John McCormack IV          Telephone:  (202) 262-7011

AO 93  (Rev. 11/13) Search and Seizure Warrant          Agent:          Aaron Hann          Telephone:  (313) 348-5860

# UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

|  |  |
|---|---|
| In the Matter of the Search of ) | Case: 5:19−mc−51303 |
| *(Briefly describe the property to be searched* ) | Assigned To : Levy, Judith E. |
| *or identify the person by name and address)* ) | Assign. Date : 9/9/2019 |
|  ) Case No. | Description: RE: SEALED MATTER |
| Dr. Anthony Weinert, DPM., P.C. ) | (EOB) |
| 3272 East 12 Mile  Suite #101 ) |  |
| Warren, Michigan 48092 ) |  |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before   September 23, 2019 _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to  Hon. Anthony P. Patti _____ .
                                                                                            *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      September 9, 2019   3:37 pm _____

_____
*Judge's signature*

City and state:      Detroit, Michigan _____

Hon. XXXXXX XXXXXX   U. S. Magistrate Judge
David R. Grand          *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*